| | | | |
|---|---|---|---|
| **CYNTHIA SMITH RUSSELL,** | ) | | |
| **Individually, and as Adminstratix of the** | ) | | |
| **ESTATE OF JASON WAYNE** | ) | | |
| **HENDRIX, Deceased, and on behalf of** | ) | | |
| **all other wrongful death beneficiaries,** | ) | | |
| | ) | | |
| **Plaintiff,** | ) | | |
| | ) | | |
| **v.** | ) | **No. 1:16-cv-00098** | |
| | ) | **CHIEF JUDGE CRENSHAW** | |
| **OTIS CAMPBELL, JR., M.D; ELLEN** | ) | | |
| **FOWLKES, R.N.; AMANDA DAVIS,** | ) | | |
| **R.N.; LINDA FLOWERS, R.N.; and** | ) | | |
| **MHM HEALTH PROFESSIONALS** | ) | | |
| **INC.** | ) | | |
| | ) | | |
| **Defendants.** | ) | | |

## MEMORANDUM

Pending before the Court is the Motion for Partial Summary Judgment (Doc. No. 36) filed by Defendants Otis Campbell, Jr., M.D., Ellen Fowlkes, R.N., Amanda Davis, R.N., and Linda Flowers, R.N., to which Plaintiff Cynthia Smith Russell has responded in opposition (Doc. No. 43) and Defendants have replied (Doc. No. 48). For the reasons that follow, the Motion will be granted in part and denied in part.

## I. Background[1]

This is an action for deliberate indifference and wrongful death under 42 U.S.C. § 1983, and

---

[1] The following facts are based primarily upon the parties' statements of undisputed facts and responses thereto, together with medical records from the Tennessee Department of Corrections ("TDOC"). Plaintiff's Statement of Facts and Defendants' responses (Doc. No. 49) are cited as "PSOF"; Defendants' Statement of Facts and Plaintiff's responses (Doc. No. 43-2) are cited as "DSOF"; and the records from the prison, found at docket entries number 38 and 43-4, are cited as "TDOC."

for violations of the Tennessee Health Care Liability Act, Tenn. Code Ann. ¶ 29-16-101.  It is brought by Plaintiff, individually, and on behalf of the estate of her son, Jason Wayne Hendrix.

Mr. Hendrix was an inmate at the Turney Center Industrial Complex ("Turney Center"), a TDOC facility.  The individual Defendants all provided medical services at the facility: Otis Campbell, Jr. as a physician; and Ellen Fowlkes, Amanda Davis, and Linda Flowers as registered nurses.

On November 8, 2015, Mr. Hendrix fell on the metal commode in his cell, injuring his shoulder.  Plaintiff attributes the fall to Mr. Hendrix having eaten undercooked chicken that had been served to several inmates at the Turney Center on November 3, 2015.  (PSOF ¶¶ 6, 8).

Dr. Campbell examined Mr. Hendrix's shoulder on November 8, 2015, and ordered an x-ray of Mr. Hendrix's shoulder and side.  Dr. Campbell also prescribed Motrin, Toradol, and an analgesic balm.  (Id. ¶ 9).

On November 13, 2015, Plaintiff called his mother and told her that he had shoulder and severe stomach pain.   He also told her that he was in his cell, but expected to be transferred to the Turney Center's on-site clinic on November 16, 2015.  (Id. 10, 11).

At approximately 7:30 p.m. on November 17, 2015, Mr. Hendrix was transferred to the clinic. (TDOC p. 270).  At the time, he told Nurse Fowlkes that he had been experiencing diarrhea and vomiting for two days.  He also reported pain, a dry mouth, dizziness, and nausea upon standing. (PSOF ¶ 1).  Noting "[d]ehydration and possible fluid deficit," Nurse Fowlkes, pursuant to Dr. Campbell's instructions,  started an intravenous ("IV") line and provided Mr. Hendrix with Vicodin and Parafon Forte, the latter of which he refused to take.  (Id.; TDOC p. 270).  Nurse Fowlkes' shift ended around 10:00 p.m., and Nurse Flowers assumed responsibility for Mr. Hendrix's care.

(Fowlkes' Aff. ¶ 5).

Around 10:05 p.m., Mr. Hendrix fell while guards were escorting him down a clinic corridor. He was helped to a chair in the hallway and then walked unescorted to Room 2 where he told Nurse Flowers, "I don't know what happened, I think I passed out." (TDOC p. 270). Mr. Hendrix also stated, "I told y'all that I was hurting bad," and that, "I'm really sick. I'm not making this up." (PSOF ¶ 14; TDOC p. 270).

Nurse Flowers found Mr. Hendrix to be "diaphoretic" (*i.e.* sweating heavily), and he stated that he was too sick to take off his clothing in order to be examined. His pulse rate at the time was 120 beats per minute (bpm). (PSOF ¶¶ 15, 16; TDOC p. 269). Because Mr. Hendrix claimed to be hot, Nurse Flowers brought him a fan. (TDOC 269). As Nurse Flowers was leaving the room Mr. Hendrix asked if he could turn off the light, but Nurse Flowers demurred, saying she wanted to keep an eye on him. (Id.).

Less than thirty minutes later, at approximately 10:40 p.m., Nurse Flowers return to Mr. Hendrix's room, at which time he disrobed so that he could be examined. After the examination, Mr. Hendrix was provided with a urinal and given instructions on how to use it so that the medical staff could see how much urine he produced. (Id. at 268). Before leaving, Nurse Flowers showed Mr. Hendrix how to use the call light if he needed attention.

Mr. Hendrix was rechecked by Nurse Flowers at 1:10 a.m. on November 18, 2015, who noted that his skin was warm and dry to the touch, his lung sounds were clear, and bowel sounds were heard in all four quadrants. Nurse Flowers also examined Mr. Hendrix's neck "for obvious injury," but none was found. (Id. at 270).When asked, Mr. Hendrix was able to move his neck freely from side-to-side. At that time, Mr. Hendrix stated, "If I try to stand up I feel like I will faint." (Id.

at 267-268).

At 1:30 a.m. on November 18, 2015, Mr. Hendrix was observed on camera going to the bathroom. Upon finishing, he activated the call light to summon Nurse Flowers. She found that Mr. Hendrix's stools were "black (tarry) and showed 'frank' [*i.e.* visible] blood." (TDOC p. 267). Mr. Hendrix admitted that, within a two-day period, he had ingested 30 Naproxen pills, 24 Motrin pills, and most of a prescription for Mobic tablets. (PSOF ¶ 1; TDOC p. 266). He claimed to have taken that medicine because his shoulder was still hurting. (TDOC p. 267). Nurse Flowers told Mr. Hendrix that so much medicine in such a short period could cause a "GI bleed" and "make him feel like he was going to faint and feel very weak." (Id.). Nurse Flowers noted on the chart "G.I. bleed/ previous shoulder injury." (Id.).

After finishing with Mr. Hendrix, Nurse Flowers called Dr. Campbell to inform him about what she had learned. (PSOF ¶ 20, TDOC p. 266). Nurse Flowers was instructed to keep Mr. Hendrix in the clinic, observe him, and monitor his vital signs every two hours until Dr. Campbell came into the clinic. (TDOC p. 266).

Approximately two hours latter, at 3:30 a.m. on November 18, 2015, Nurse Flowers went in to see Mr. Hendrix and told him that Dr. Campbell had been called and would examine him that morning. Mr. Hendrix reported that he was still very weak. Nurse Flowers told him that this could be caused by a "GI Bleed" given the medications he had taken. (TDOC p. 265). Plaintiff characterizes Nurse Flowers's note to that effect as being a diagnosis that Mr. Hendrix had a gastrointestinal hemorrhage. (PSOF ¶ 21).

At 5:30 a.m. that day, Nurse Flowers looked in on Mr. Hendrix again and found his skin to be "slightly clammy/warm." (TDOC p. 264). She wrote in her notes "GI Bleed," (id.), which

Plaintiff again characterizes as a diagnosis of a "gastrointestinal hemorrhage." (DSOF ¶ 21). Nurse Flowers updated Dr. Campbell on Mr. Hendrix's condition and was instructed to continue monitoring him. Dr. Campbell also ordered a complete blood count ("CBC") to determine blood loss, but those results did not return until after Mr. Hendrix left the Turney Center clinic. (PSOF ¶¶ 4, 5).

Nurse Davis relieved Nurse Flowers at around 6:00 a.m. on November 18, 2015. When Nurse Davis went to see Mr. Hendrix at 7:30 a.m., he stated, "I'm hurting so bad in my stomach and my neck, you've got to help me." (TDOC p. 264). Mr. Hendrix was examined and his heart rate was 109 bpm.

Nurse Davis drew blood for the CBC as ordered by Dr. Campbell, a procedure that Mr. Hendrix "tolerated well." (Id.). Further, because Mr. Hendrix's skin was clammy and he complained of being hot, he was given a cold compress to place on his head and ice water. He was also provided breakfast. (Id.).

Around 9:00 a.m., Mr. Hendrix used the call light to summon Nurse Davis. When she entered the room, Mr. Hendrix stated that he was unable to sit and felt "like he would pass out." (PSOF ¶ 25). He also stated, "My head hurts now with my neck and I think it[']s to do with that fall." (TDOC p. 263). Upon examination, Mr. Hendrix's skin was found to be "pale and clammy," and he had a heart rate of 118 bpm. (Id.).

Nurse Davis called Dr. Campbell and was instructed to continue monitoring Mr. Hendrix. Dr. Campbell also ordered an x-ray of Mr. Hendrix's spine and skull.

Mr. Hendrix was not examined again by Nurse Davis through the remainder of her shift. However, Nurse Davis claims that she and other nurses continued to monitor him by camera, until

her shift ended around 2:00 p.m.  (Doc. No. 36-2, Davis Aff. ¶¶ 8, 9).

Mr. Hendrix was examined by Dr. Campbell at 1:00 p.m. on November 18, 2015.  At the time, Mr. Hendrix reported that he was hurting all over.  His temperature was 98.4° degrees Fahrenheit, his blood pressure was 138/70 and his pulse rate was 120 bpm.  Upon examination, Dr. Campbell found "mild tenderness along [the] C-spine, as well as "mild epigastric tenderness of the abdomen."  (TDOC p. 263).

Dr. Campbell diagnosed a "GI hemorrhage," secondary to "NSAID toxicity."  (Id.).  In an affidavit filed in support of Defendants' Motion, Dr. Campbell asserts that he believed Mr. Hendrix "likely suffered from gastritis due to ingesting an excessive amount of nonsteroidal anti-inflammatory drugs ('NSAIDs')."  (Doc. No. 36-1, Campbell Aff. ¶ 13).  Dr. Campbell prescribed intravenous fluids, along with a liter of D5NS, (TDOC p. 263), which is a fluid containing electrolytes and calories.  He also prescribed Lortab for pain, Benadryl for nausea, and Omeprazole (Prilosec) to help treat gastritis or peptic ulcer disease.  (Id.; Campbell Aff. ¶ 6).  Dr. Campbell wrote on the chart, "admit to infirmary."[2]

By 2:30 p.m., Mr. Hendrix was in the infirmary and Nurse Fowlkes had come back on duty. When she examined Mr. Hendrix, he reported that he was sick and nauseous and that, "my arm hurts, and I can't use it."  (TDOC p. 367).  She noted that Mr. Hendrix had a heart rate of 113 bpm while lying down, and 133 bpm while sitting.  Mr. Hendrix complained of nausea and a lack of appetite.  (TDOC p. 367).  Per Dr. Campbell's prior orders, she started an IV line and administered Vicodin.  Nurse Fowlkes noted that she would continue to monitor the situation.

---

[2] The medical charts show that Mr. Hendrix was initially in "Room 2," later in the "clinic," and still later in the "infirmary."  The record submitted by the parties, however, does not indicate the layout of the clinic, or equipment that was available in particular areas of the clinic.

Nurse Fowlkes last examined Mr. Hendrix at 7:30 p.m. At the time, Mr. Hendrix again reported dizziness and abdominal pain. He had a heart rate of 112 bpm while lying down, and 136 bpm while sitting. (TDOC p. 367). Nurse Fowlkes called Dr. Campbell to report Mr. Hendrix's condition and was told to continue administering IV fluids. (Docket No. 36-4, Flowers Aff. ¶ 7). Nurse Fowlkes was relieved by Nurse Flowers at around 10:00 p.m.

Mr. Hendrix was seen by Nurse Flowers at 11:30 p.m., at which time he stated, "I'm going to die . . . y'all are going to let me die." (TDOC p. 366). She noted Mr. Hendrix was "anxious" and "very pale," his "eyes [were] fully dilated," and his "mouth mucus [was] dry and white." (Id.). He complained of abdominal pain and "bowel sounds" were found to be present. His recorded heart rate at the time was 128 bpm. After finishing with Mr. Hendrix, Nurse Flowers called Dr. Campbell and informed him of Mr. Hendrix's status. Dr. Campbell told her to continue monitoring and that he would examine him the following morning.

At 1:17 a.m. on November 19, 2015, Mr. Hendrix yelled out for a nurse. Upon entering the room, Nurse Flowers found him lying on the floor next to the toilet with blood and stool mixed on his feet, legs, arms, and abdominal area. (Id.).[3] Nurse Flowers was unable to take Mr. Hendrix's vitals. Instead, he was placed on a stretcher and taken to the shower, where the blood and stool on his body was washed away.

Nurse Flowers took Mr. Hendrix's vitals at 1:32 a.m., which showed his blood pressure to be 78/48 and his pulse rate to be 130 bpm. She immediately reported those numbers to Dr. Campbell who ordered that Mr. Hendrix be transported by ambulance to a hospital. (Id.).

---

[3] Nurse Flowers's notes indicated that she called Dr. Campbell two minutes later, but they do not reflect whether contact was actually made with him.

At approximately 2:17 a.m. on November 19, 2015, personnel from the Hickman County EMS Service arrived at the Turney Center. The Patient Care Record from the paramedics indicates in the Initial Assessment section that Mr. Hendrix was "in and out of responsiveness." (Doc. No. 43-4, Hickman County EMS Record at 1). The Clinical Impression section lists "hypovolemia/shock" as the primary impression, and "major loss of blood via rectal bleeding for three (3) days" as the chief complaint. (Id.).

In the Narrative section of the form, paramedics attributed to the nursing staff at Turney Center the comment that, "we couldn't get him transferred until tonight," that "she thinks he's fixing to die," and that "he had been here in clinic for at least 2 days." (Id. at 2). The narrative also lists as a "General Impression" that Mr. Hendrix was "laying in a bed in obvious pain and extremely dry, pale, with obvious signs of shock." (Id.). The narrative also states that "intervention prior to arrival [was] very minimal, no iv, just comfort measure is all EMS was able to recognize." (Id.).

Because of the need for emergency medical care, Mr. Hendrix was transported to the TriStar Natchez Emergency Room. En route, he lost blood pressure, requiring paramedics to administer cardiopulmonary resuscitation ("CPR"). (PSOF ¶¶ 48, 49). Due to the prolonged use of CPR, Mr. Hendrix developed an anoxic brain injury. (Id. ¶ 50).

Mr. Hendrix was transferred to Centennial Medical Center for a higher level of care and arrived at 5:27 a.m. on November 19, 2015. He was then placed on a ventilator. (Id. ¶ 51). When his condition did not improve, he was transferred on December 4, 2015 to Nashville General Hospital for percutaneous endoscopic gastrostomy (PEG) tube placement and tracheostomy care. (PSOF ¶ 52).

Mr. Hendrix died at the Nashville General Hospital on December 17, 2015, at the age of 38.

(PSOF ¶ 1).  According to the coroner's report, his death was caused by "complications of gastrointestinal bleed (duodenal ulcer)," with a contributing cause being "nonsteroidal anti-inflammatory drugs [sic] abuse, Hepatitis C."  (Doc. No. 43-6 at 2).

## II.  <u>Standard of Review</u>

Summary judgment is appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); <u>Pennington v. State Farm Mut. Auto. Ins. Co.</u>, 553 F.3d 447, 450 (6th Cir. 2009).  The party bringing the summary judgment motion has the initial burden of informing the Court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts.  <u>Rodgers v. Banks</u>, 344 F.3d 587, 595 (6th Cir. 2003).  In deciding a motion for summary judgment, the Court must review all the evidence, facts and inferences in the light most favorable to the nonmoving party.  <u>Van Gorder v. Grand Trunk W. R.R., Inc.</u>, 509 F.3d 265, 268 (6th Cir. 2007).  The Court does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986).  Instead, the Court determines whether sufficient evidence has been presented to make the material issue of fact a proper jury question.  <u>Id.</u> The mere existence of a scintilla of evidence in support of the nonmoving party's position will be insufficient to survive summary judgment; rather, there must be evidence on which the jury could reasonably find for the nonmoving party.  <u>Rodgers</u>, 344 F.3d at 595.

## III.  <u>Legal Analysis</u>

Plaintiff's federal claims as set forth in Counts I and III of the Complaint allege violations of the Eighth Amendment.  More specifically, in Count I she brings a survival action under 42 U.S.C.  § 1983 claiming that all four Defendants were deliberately indifferent to her son's serious

medical needs and, as a consequence, deprived him of his Eighth Amendment right to be free from cruel and unusual punishment. In Count III Plaintiff brings a wrongful death action under 42 U.S.C. § 1983, again asserting that Defendants were deliberately indifferent to her son's serious medical needs.

## A. Deliberate Indifference

Under the Eighth Amendment, prison officials are prohibited from "unnecessarily and wantonly inflicting pain" on an inmate by acting with "deliberate indifference" toward the inmate's serious medical needs. Estelle v. Gamble, 429 U.S. 97, 104 (1976). Such indifference may be shown by "intentionally denying or delaying access to medical care." Id.

"'Deliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." Connick v. Thompson, 131 S. Ct. 1350, 1360 (2011). That is, it must be shown that the prison official was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer v. Brennan, 511 U.S. 825, 837 (1994). This means that an individual seeking to recover on a claim for deliberate indifference must establish both an objective and a subjective component.

"The objective component requires the existence of a 'sufficiently serious' medical need." Blackmore v. Kalamazoo Cty., 390 F.3d 890, 895 (6th Cir. 2004) (citing Farmer, 511 U.S. at 834; Estelle, 429 U.S. at 104). This component is "analyzed . . . 'in the abstract,'" Richko v. Wayne Cty., 819 F.3d 907, 916 (6th Cir. 2016) (quoting Clark-Murphy v. Foreback, 439 F.3d 280, 286-87 (6th Cir.2006)), and can be established in one of two ways:

> First, if a plaintiff suffered from a minor or non-obvious medical condition, he can show that his condition was objectively serious "if it is 'one that has been diagnosed

by a physician as mandating treatment.'" . . . Second, "where a plaintiff's claims arise from an injury or illness that is 'so obvious that even a layperson would easily recognize the necessity for a doctor's attention,'" the plaintiff can meet the objective prong by showing "'that he actually experienced the need for medical treatment, and that the need was not addressed within a reasonable time frame.'"

Mattox v. Edelman, 851 F.3d 583, 598 (6th Cir. 2017) (internal citations omitted) (quoting Blackmore, 390 F.3d at 895).

"The subjective component requires [a plaintiff] to show that prison officials have 'a sufficiently culpable state of mind in denying medical care.'" Blackmore, 390 F.3d at 195 (quoting Brown v. Bargery, 207 F.3d 863, 867 (6th Cir. 2000)). This is done by establishing that "1) 'the official being sued subjectively perceived facts from which to infer a substantial risk to the prisoner,' (2) the official 'did in fact draw the inference,' and (3) the official 'then disregarded that risk.'" Richko, 819 F.3d at 915 (quoting Rouster v. Cty. of Saginaw, 749 F.3d 437, 446 (6th Cir.2014)). This component "must be addressed for each officer individually," Garretson v. City of Madison Heights, 407 F.3d 789 (6th Cir.2005), although "'general allegations of liability,' so long as they are not 'broad and conclusory accusations,' can provide sufficient evidence from which a trier of fact could infer that each individual correctional officer" had a sufficient state of mind," Richko, 819 F.3d at 916 (quoting Phillips v. Roane Cty., 534 F.3d 531, 542 (6th Cir.2008)).

## B. Parties's Positions

In this case, the parties recognize the standards underlying a deliberate indifference claims as well as their essential components. They differ markedly, however, in its application both as to when the serious medical need began and as to who is culpable for failing to address that need.

Plaintiff argues that all four individual Defendants are liable, insisting that the serious medical need arose when Mr. Hendrix "was diagnosed with a 'GI bleed' on November 18, 2015 at

1:30 a.m." (Docket No. 43-1 at 11). Defendants argue that none of them are liable because it was not until almost 24 hours later that Mr. Hendrix's medical condition became "serious–even to a layperson" when he yelled for help at 1:17 a.m. on November 19, 2015, at which time an ambulance was summoned and he was taken to the hospital. (Doc. No. 29 at 19). In the Court's opinion, however, a reasonable jury could find that the facts lie somewhere in between.

## C. Period Before 11:30 p.m On November 18, 2015

Even when the facts are construed in Plaintiff's favor as they must be for present purposes, no reasonable jury could find that any of the Defendants were deliberately indifferent at any point prior to 11:30 p.m. on November 18, 2015.

When Mr. Hendrix first arrived at the clinic at 7:30 p.m. on November 17, 2015, he claimed to have been suffering from diarrhea and vomiting for the past two day, and complained of dry mouth, dizziness and nausea. This condition, while perhaps unsettling to Mr. Hendrix, was not necessarily a serious medical need in a constitutional sense because it could suggest at routine ailment, such as the flu. See Allen v. Ferrel, 2013 WL 1222127, at *9 (D. Colo. Feb. 13, 2013) (collecting cases for the proposition that flu-like symptoms, including, vomiting, stomach cramping, and diarrhea do not constitute a serious medical need); Kennedy v. Dallas Police Dep't, 2007 WL 30260, at *4 (N.D. Tex. Jan. 4, 2007) (collecting cases holding that typical flu-like symptoms are insufficient to support a deliberate indifference claim). Indeed, Plaintiff does not suggest otherwise. Besides, the record shows that, upon presentation of the symptoms, Dr. Campbell was contacted by Nurse Fowlkes and Mr. Hendrix was given IV fluids and provided with Vicodin and Parafon Forte.

Likewise, Mr. Hendrix's condition between 10:00 p.m. and 1:30 a.m. the following day was likely not a serious medical need within the meaning of the Eighth Amendment. During that period

he complained of being sick and, at one point, was sweating heavily. Again, this is suggestive of a minor malady, such as the flu, that, without more, is routinely found not to constitute a serious medical need. See id. The only remarkable difference between his condition at this point and when he first entered the clinic was that he fainted or passed out momentarily, but even this does not mean he had a serious medical need within the meaning of the Eighth Amendment. See Clark v. Maryland Dep't. of Public Safety & Corr. Serv., 316 Fed. App'x 279, 282-83 (4th Cir. 2009) (finding no serious medical need where inmate passed out in cell and struck head but had no visible sign of injury and was able to communicate clearly); Toler v. Halley, 2010 WL 4736867, at *2 (N.D. Fla. Nov. 16, 2010) (concluding that "a single incident of [an inmate] passing out in the recreation yard" was "insufficient to support an Eighth Amendment claim"). Plaintiff appears to agree because she does not suggest that this serves as a basis for the Eighth Amendment claim on behalf of her son.

Plaintiff insists, however, that Mr. Hendrix had a serious medical need at 1:30 a.m. on November 18, 2015 when he summoned Nurse Flowers and she found that his stools were black and showed visible blood. By itself, the existence of blood in or on the stools might not be indicative of a serious medical need. It may, for example be a sign of something benign as a hemmoroid. Johnson v. Sisto, 2012 WL 1622348, at *5 (E.D. Cal. May 8, 2012); see Laurensau v. Pluck, 2014 WL 6774125, at *3 (W.D. Pa. Dec. 1, 2014) (stating that "having blood in one's stool on a single occasion does not, standing alone, suggest that Plaintiff was suffering from a serious medical need, i.e., one that could lead to substantial suffering, injury or death").

Nevertheless, Nurse Flowers' findings cannot be divorced from context. Not only had Mr. Hendrix earlier reported vomiting and diarrhea for the past two days, he confessed to her that he had ingested a large amount of NSAID prescription drugs during that same period. The Court has little

hesitation in concluding that Mr. Hendrix had a serious medical need at this time.

The inquiry does not end, however, because Plaintiff must also show that Defendants were deliberately indifferent to that serious medical need. This is the subjective component and

> requires a plaintiff to prove that the doctors had a "sufficiently culpable state of mind," equivalent to criminal recklessness. . . . To be liable, the doctors need not act "for the very purpose of causing harm or with knowledge that harm will result," . . . they must act with more than mere negligence. . . . Still, a prison doctor "has a duty to do more than simply provide some treatment to a prisoner who has serious medical needs; instead, the doctor must provide medical treatment to the patient without consciously exposing the patient to an excessive risk of serious harm."

Santiago v. Ringle, 734 F.3d 585, 591 (6th Cir. 2013) (citations omitted).

Nothing in the record suggests that any of the Defendants acted with anything approaching recklessness for the period before 11:30 p.m. on November 18, 2015, let alone criminal recklessness. To the contrary, the record shows that, even though Mr. Hendrix's complaints were a moving target, the medical staff at the Turney Center sought to address those complaints and the condition that they thought he was suffering from, *i.e.*, gatrointestinal complications from the ingestion of too many NSAIDs. Just a summary of what each Defendant did suffices to shows this to be the case.

Nurse Flowers did not ignore what she discovered. Instead, she recognized the possible reason for Plaintiff's ailment and called Dr. Campbell, who told her to keep Mr. Hendrix in the clinic under observation and to take his vital signs every two hours until he arrived. Nurse Flowers then looked in on Mr. Hendrix twice within the next four hours and, after visiting him the second time, updated Dr. Campbell, who not only instructed her to keep monitoring him, but also ordered a CBC in an effort to determine the amount of blood that may have been lost.

Nurse Davis, who had the least interaction with Mr. Hendrix, continued with his care. She took his vitals and, when he was found to be "clammy" and complained of being hot, she gave him a cold compress, ice water and breakfast. Then, when Mr. Hendrix complained about his head and

neck hurting and suggested that the pain might have been the result of his prior fall, Nurse Davis called Dr. Hendrix who ordered a spine and skull x-ray.

Dr. Campbell physically examined Mr. Hendrix within twelve hours of Nurse Flowers's first learning that he had take a large amount of NSAIDs. With that background and based upon what he had heard from the nursing staff and what was charted, Dr. Campbell diagnosed Mr. Hendrix with a GI hemorrhage and drugs for pain, nausea, and gastritis. He ordered IV-fluid to restore hydration and provide nutrients.[4] Little more than an hour later, Nurse Fowlkes started the IV line and provided Mr. Hendrix with Vicodin. She also checked on Mr. Hendrix another time and relayed his complaints to Dr. Campbell.

The foregoing actions are inconsistent with being deliberately indifferent to a serious medical need, even considering (1) Plaintiff's assertion that, during this period, Mr. Hendrix was displaying– and the medical staff charted–symptoms of shock, "including blood loss, lethargy, clammy skin, tachycardia and pallor"; and (2) her contention that "[p]ursuant to policy and then-existing nursing protocols," the medical staff was obligated "to immediately call for emergency transport" for a patient in shock. (Doc. No. 43-1 at 18).

It may be that the conditions identified by Plaintiff are indicative of shock, but it does not follow necessarily that those conditions are unsuggestive of other underlying problems, such as gastritis or a GI hemorrhage. Plaintiff presents no medical proof to establish that Mr. Hendrix was in shock but, even if she had, "[t]he subjective requirement is designed 'to prevent the constitutionalization of medical malpractice claims; thus, a plaintiff alleging deliberate indifference must show more than negligence or the misdiagnosis of an ailment.'" Rouster, 749 F.3d at 446-47

---

[4] He also directed that Mr. Hendrix be admitted to the infirmary, the significance of which is unclear from the record but, presumably, means something.

(quoting Comstock v. McCrary, 273 F.3d 693, 703 (6th Cir. 2001).[5]  "Accordingly, '[w]hen a prison doctor [or nurse] provides treatment, albeit carelessly or inefficaciously, to a prisoner, he has not displayed a deliberate indifference to the prisoner's needs, but merely a degree of incompetence which does not rise to the level of a constitutional violation.'"  Johnson v. Karnes, 398 F.3d 868, 875 (6th Cir. 2005) (quoting Comstock 273 F.3d at 703).

## D. Period From 11:30 p.m. On December 18, 2015 Until EMS Arrives

None of the foregoing is to suggest that, to prevail on a deliberate indifference claim, a plaintiff must always have verifying medical proof.  See Harris v. City of Circleville, 583 F.3d 356, 368 n.6 (6th Cir. 2009) (quoting Blackmore, 390 F.3d at 897) ("[W]here a plaintiff's claims arise from an injury or illness so obvious that even a layperson would easily recognize the necessity for a doctor's attention . . .  the 'plaintiff need not present verifying medical evidence to show that, even after receiving the delayed necessary treatment, his medical condition worsened or deteriorated.  Instead, it is sufficient to show that he actually experienced the need for medical treatment, and that the need was not addressed within a reasonable time.'").  Nor is it required, and indeed would be entirely unexpected, for a medical caregiver to fess-up to wrongdoing or shortcomings in treatment.  Rather, circumstantial evidence can be used to establish the subjective component of the deliberate

---

[5]  With regard to the constitutionalization of a state tort claim, Defendants argue that "[t]he § 1983 claims in this case are an attempt at double recovery."  (Doc. No. 39 at 15).  Maybe so, but plaintiffs are entitled to plead different claims for relief, and "[a]lthough a double recovery may not be had, the jury is not prohibited from allocating a total damages award between different theories of recovery."  Johnson v. Howard, 24 Fed. App'x 480, 485 (6th Cir. 2001); see Gibson v. Moskowitz, 523 F.3d 567, 666-67 (6th Cir. 2008) (affirming jury award for deliberate indifference and medical malpractice but remanding for proper allocation of damages); Medina v. Dist. of Columbia, 643 F.3d 323, 326 (D.C. Cir. 2011) (stating that "if a federal claim and a state claim arise from the same operative facts, and seek identical relief, an award of damages under both theories will constitute double recovery," but also noting that "a jury is not prohibited from allocating a single damages award between two distinct theories of liability").  Thus, if a jury in this case awards Plaintiff damages on both her federal constitutional claims and her state law malpractice claim, the allocation of those damages is something that will need to be sorted out at that time.

indifference prong. See Dominguez, 555 F.3d at 550 (6th Cir. 2009) (quoting Terrance v. Northville Reg'l Psychiatric Hosp., 286 F.3d 834, 843 (6th Cir. 2001) ("Because government officials do not readily admit the subjective component of this test, it may be 'demonstrat[ed] in the usual ways, including inference from circumstantial evidence . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.'").  In fact, it is precisely for these reasons that the Court finds that a jury should decided whether Nurse Flowers and Dr. Campbell were deliberately indifferent for their action (or inactions) from 11:30 p.m  on November 18, 2015, until the arrival of the emergency medical responders.

On the one hand, a jury could conclude that Defendants Campbell and Flowers saw and acknowledged an obvious risk, but decided to take the easy course.  They could do so based on the following view of what has been presented in the summary judgment record:

When Nurse Flowers came back on her shift at around 10:00 p.m., she waited more than an hour and a half to examine Mr. Hendrix even though, 22 hours earlier, she determined that he was suffering from a GI bleed and the charting thereafter did not show improvement.  When she did examine Mr. Hendrix, he began with the ominous statement, "I'm gonna die . . . y'all going to let me die," (TDOC p. 366) and, even though Nurse Flowers recorded that he was "anxious," was "very pale," and his eyes were "fully dilated" (id.)[6] she did nothing other than to call Dr. Campbell who, in turn, merely suggested continued monitoring.  No medication was given and, from all outward appearance, no IV fluids were being administered at that time.  Thereafter, Nurse Flowers did not look in on Mr. Hendrix until almost two hours later, and, even then, only after she heard a yell for

_____

[6] Although Nurse Flowers submitted an affidavit in support of Defendants' Motion for Summary Judgment, Mr. Hendrix's condition at this point in time is not further explained.  In fact, in her affidavit, all she states is that "[a]round 11:30 p.m., I took Mr. Hendrix's vitals and noted that he was very pale."  (Doc. No. 36-3, Flowers Aff. ¶ 10).

help.

Furthermore, the records from the EMS crew that responded to the call may be viewed by a jury as suggesting that something was seriously amiss. Those records indicate that Mr. Hendrix was obviously in shock and obviously in pain, yet there appeared to be only the minimum of care– not even an IV–given prior to their arrival. Paramedics also attributed to someone on the nursing staff the statement that she believed Mr. Hendrix was "fixing to die,"and to making the curious comment that "we couldn't get him transferred until tonight[.]" (Doc. No. 43-4 Hickman County EMS Record at 2). That someone may well have been Nurse Flowers given that she was still on duty and was the one who recorded the events up until the paramedics left the prison with Mr. Hendrix.

On the other hand, a jury might well find the foregoing evidence does not show deliberate indifference by either Nurse Flowers or Dr. Campbell. For example, the jury could conclude that Mr. Hendrix's statement about dying was a continuation of his many complaints about pain during the time he was in the clinic; Nurse Flowers characterization of him as being "very pale" was really the same as Nurse Davis's description of him as being "pale;" no medication was provided because Mr. Hendrix was not in that bad of shape; and, because he was not in dire straits, Nurse Flowers found it unnecessary to check on him when she first arrived on duty, or to revisit until he summoned help. Similarly, the jury could find that Mr. Hendrix had a precipitous decline between the time Nurse Flowers saw him at 11:30 and the time the paramedics arrived such that their observations are entitled to little weight; the reason no IV fluids were being administered was because Mr. Hendrix had been showered so that his vitals could be taken; and the statement that Mr. Hendrix was "fixing to die" was a present-sense impression of the nurse, not something Nurse Flowers felt more

than two hours earlier.

Admittedly, the Court finds the deliberate indifference claims as to Nurse Flowers and Dr. Campbell to present a close question, "'but the need to resolve factual issues in close cases is the very reason we have juries.'" Harden v. AlliedBarton Sec. Serv., 2013 WL 2467714, at *8 (M.D. Tenn. June 7, 2013) (quoting First Nat'l of Omaha v. Three Dimension Sys. Prod., Inc., 289 F.3d 542, 545 (8th Cir.2002)). And, while Defendants argue that the EMS records should be discounted if not ignored, because "Defendants' own sworn statements . . . show that Mr. Hendrix received extensive treatment," (Doc. No. 48 at 8), "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge[.]" Anderson, 477 U.S. at 255.[7]

## IV. Conclusion

On the basis of the foregoing, Defendants' Motion for Partial Summary Judgment (Doc. No.36) will be **GRANTED IN PART** and **DENIED IN PART**. The Motion will be granted with respect to Plaintiff's claims for deliberate indifference as to Defendants Fowlkes and Davis, but denied with respect to the deliberate indifference claims against Defendants Campbell and Flowers.

An appropriate Order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE

---

[7] In arriving at this conclusion, the Court has considered Sosebee v. Murphy, 797 F.2d 179 (4th Circ. 1986), a case relied upon by Defendants. As Defendants concede, however, that decision is not binding. More importantly, they also acknowledge "the facts are different[,]" (Doc. No. 39 at 23), yet "a court must undertake a 'particularized fact-specific inquiry'" when determining whether medical care was "grossly inadequate," Miller v. Calhoun, 408 F.3d 803, 819 (6th Cir. 2005), which the Court has done here.